Solomon **MYREE**, Sr., Plaintiff,

v.

**LOCAL 41, INTERNATIONAL BROTH-ERHOOD OF ELECTRICAL WORKERS, Defendant.**

**No. CIV–85–1427S.**

United States District Court, W.D. New York.

March 6, 1992.

John J. Giardino, Giardino & Schober, Buffalo, N.Y., for plaintiff.

Craig L. Miller, Buffalo, N.Y., for defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Solomon Myree, Sr. ("plaintiff") is a black male, born November 27, 1936. In 1985, the plaintiff filed this lawsuit alleging that the defendant Local 41, International Brotherhood of Electrical Workers ("Local 41") discriminated against him because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").

Between February 19 and February 27, 1991, this Court held a five-day bench trial with respect to the issue of liability only. This Decision constitutes the Court's Findings of Fact and Conclusions of Law with respect to liability.

In 1973, the plaintiff enrolled in an affirmative action Journeyman Electrician training program ("the training program") funded by the State of New York and cosponsored by the Buffalo Affirmative Action Program, the Western New York Chapter of the National Electrical Contractors Association and Local 41.

The plaintiff's Journeyman Electrician training consisted of institutional and on-the-job training components. The institutional training comprised approximately ten months of full time classroom instruction plus four weeks of simulated on-the-job instruction. The on-the-job training comprised approximately four weeks of actual on-the-job experience with Buffalo area electrical contractors. According to the training program plan, upon completing his institutional and on-the-job training, plaintiff became eligible to sit for the Journeyman's Electrician examination administered by Local 41 ("the Journeyman's examination"). Successful completion of the Journeyman's examination qualified the plaintiff for admission into Local 41.

The training program was, generally, an accelerated version of Local 41's apprenticeship program. The programs utilized the same coursebook material for classroom instruction, the four year inside wireman training course for apprentices, and both culminated with the Journeyman's examination which tested the classroom material. While the training program participants were minority individuals, the participants in the apprentice program were, for the most part, nonminority individuals.

After completing his institutional and on-the-job training in December 1974, the plaintiff sat for his first Journeyman's examination administered by Local 41 in January 1975. The plaintiff failed the examination. The plaintiff sat for a second Journeyman's examination in May 1975 and, again, failed.

On March 12, 1976, the plaintiff filed a state law racial discrimination claim with the New York State Division of Human Rights ("State Division"). The plaintiff also filed the same racial discrimination charge with the United States Equal Employment Opportunity Commission ("EEOC") by virtue of authorizing the State Division to transmit a copy of his claim to the EEOC. Although the EEOC deemed the plaintiff's charge filed on March 12, 1976, there is no evidence that the EEOC ever contacted the plaintiff with respect to his EEOC charge. On January 25, 1978, after completing its investigation, the State Division issued a notice of probable cause of discrimination without factual findings.

On November 22, 1985, the plaintiff, proceeding *pro se*, filed this lawsuit, claiming that Local 41, NECA, the New York State Department of Labor and the Buffalo Affirmative Action Program discriminated against him in violation of Title VII. This lawsuit was originally assigned to the Hon. John T. Curtin, who, by Order signed December 15, 1987, dismissed the plaintiff's lawsuit against all defendants except Local 41 on technical grounds. Shortly thereafter, Judge Curtin granted the plaintiff's motion for appointment of counsel and, on October 5, 1990, transferred the case to this Court.

Between the dates of February 19 and February 27, 1991, this Court held a bench trial addressing only the issue of Local 41's liability. This Court heard the testimony of four witnesses called by the plaintiff: Daniel Erker, current Business Manager of Local 41, John Wright, a participant in Local 41's training program, Harold Hudson, another training program participant, and John Mose, a former director of the Buffalo Affirmative Action Program. Local 41 called one witness in its case in chief, Daniel Erker.

At trial the plaintiff contended that Local 41 committed racial discrimination against him under theories of disparate treatment and disparate impact. With respect to disparate treatment, the plaintiff claimed that Local 41 applied different admissions policies with respect to the minority participants in the training program ("the trainees"), such as the plaintiff, and the mostly nonminority participants in the apprentice program ("the apprentices"). Specifically, the plaintiff contended that although Local 41 conditioned plaintiff's union membership on his successful completion of the Journeyman's examination, Local 41 admitted apprentices before they sat for the Journeyman's examination. The plaintiff also claimed that Local 41 designed his Journeyman's examinations to be difficult to pass, so as to discourage his admission to the union. Finally, the plaintiff claimed that Local 41 applied different examination policies to the plaintiff and his fellow trainees than to the apprentices.

With respect to disparate impact, the plaintiff claimed that the trainees, as a whole, performed far worse on the Journeyman's examination than the apprentices and, therefore, that the examination caused the selection of minority applicants for admission to the union at a far lower rate than the non-minority apprentice applicants.

Local 41 disputed all of the plaintiff's claims and asserted that, in any event, the limitations provisions of Title VII and the doctrine of laches barred the plaintiff's recovery.

For the reasons set forth below, having considered all the evidence presented at trial, this Court finds that the plaintiff has proven by a preponderance of the evidence that Local 41 discriminated against him because of his race, in violation of Title VII. This Court also concludes that Local 41's affirmative defenses do not prevail.

## FINDINGS OF FACT

In 1970, Governor Rockefeller outlined his "Buffalo Plan" ("the Plan"), a comprehensive affirmative action scheme for the Buffalo area designed to secure "... greater minority group representation in the construction industry...." A primary focus of the Plan was to recruit and prepare minority individuals for membership in the building and construction trade unions. Buffalo area labor unions and building con-

tractors subscribing to the Plan agreed to implement training programs over a four year period to train qualified minority applicants to become skilled Journeymen tradesmen. Administrative committees comprised of representatives of labor, management and the minority community were created to promote and oversee the implementation of Journeyman training and apprenticeship programs. While funding for minority training was to be provided through federal or state government agencies, the trade unions were responsible for providing institutional and on-the-job training. (plaintiff's exh. 33).

Pursuant to the Plan, the Western New York Chapter of the National Electrical Contractors Association ("NECA") jointly with Local 41 entered into a series of year to year subcontracts, as subcontractor, with the administrative committee of the Buffalo Affirmative Action Program ("BAAP"), as contractor, to sponsor a Journeyman Electrician training program. Under the subcontracts, Local 41 and NECA, as subcontractor, agreed to

... employ, and perform all the on-the-job training services for the specified number of trainees ... [and] furnish all the instruction and other services, materials, equipment and supplies necessary therefor....

Each subcontract required that the subcontractor provide thirty-six weeks of classroom instruction, eight weeks of simulated on-the-job training and eight weeks of actual on-the-job training for twenty trainees. The subcontract also provided that during classroom instruction and simulated on-the-job training, the trainees would be paid an hourly wage stipend, $2.75 per hour according to the subcontract effective during the plaintiff's institutional training. During actual on-the-job training, trainees would be paid by the employer contractor. According to the terms of the subcontract, once the trainees completed these segments, they were eligible to "... submit an application for membership into the Electrical Workers Local Union # 41 and be scheduled for examination through the normal channels for membership." (plaintiff's exh. 23).

To gain admission to Local 41, the trainees were required to complete the training program, as outlined above, and then successfully complete the Journeyman's examination administered by Local 41.

Trainee candidates were recruited through the Buffalo Build Outreach and Recruitment Center ("Build"). A selection committee comprised of a Local 41 representative, NECA representative and a member of the minority community selected twenty individuals for a one year training program. The qualifications for admission into the training program were that the individual must have:

1) been over 25 years of age, '... the apprenticeship age ...' 2) maintained residency in the Union's jurisdiction for at least one year; 3) been '... physically able to perform the work;' 4) possessed '... a background of skills or aptitudes;' and 5) been '... fully motivated to enter the Construction Field.'

(plaintiff's exhs. 8, 23).

Funding for the training program was provided through the BAAP administrative committee by the New York State Department of Labor pursuant to the New York State Manpower Training Act, New York Labor Law Article 23–A. The total training program consisted of four training courses from 1973–1976, each designated a "Cycle," lasting over the course of about one year with approximately twenty trainees.

Sometime in late 1972 or in 1973,[1] the plaintiff interviewed for enrollment into the Journeyman Electrician training program sponsored by BAAP, Local 41 and NECA. After approval by the selection committee, the plaintiff was placed in the Second Cycle Trainee Class ("Second Cycle"). At the time of his application to the program, the plaintiff possessed a high school diploma, had some vocational training and had com-

---

**1.** This Court cannot determine the exact date which the plaintiff interviewed for admission into the training program.

pleted three years toward a bachelor's degree in education. (plaintiff's exh. 2; defendant's exh. G). The plaintiff's prior employment experience was as a laborer. (plaintiff's exh. 2). Plaintiff was one of eighteen minority participants in the Second Cycle and, on November 12, 1973, began classroom instruction. (plaintiff's exhs. 3, 31).

The classroom portion of the training program ("classroom training") consisted of five full day sessions per week over ten months. Qualified Journeyman Electricians selected by Local 41 instructed the classroom training sessions. The training materials used by the plaintiff, and the other Second Cycle trainees, were the standard apprentice training books designed by the National Joint Apprentice Training Committee for the apprentice Journeyman Electrician four year training course. (*See* exhs. 25–27). Each coursebook represented one year of apprentice training. They were the same materials which Local 41 used to instruct its apprentices over a four year period; although the classroom portion of the apprentice program occurred once per week.

During the classroom training, Local 41 tested the Second Cycle trainees weekly. On his weekly tests plaintiff maintained an average of at least 80%.[2] After finishing a yearly coursebook, the trainees took a comprehensive exam covering that year.[3] On September 13, 1974, the plaintiff completed his classroom training and simulated on-the-job training. As the term suggests, the plaintiff's simulated on-the-job training consisted of various exercises designed to create an authentic work situation. The plaintiff attended 1479.5 hours of classroom and simulated on-the-job training, missing one session and attending 213. (plaintiff's exh. 4).

On September 23, 1974, continuing his Journeyman Electrician training, the plaintiff began actual on-the-job training and was referred by Local 41 for actual jobs with two electrical contractors. On December 20, 1974, the plaintiff completed on-the-job training. (plaintiff's exh. 31).

On January 16, 1975, the plaintiff sat for his first Journeyman's examination. The plaintiff achieved a score of 14, deemed a failing grade by Local 41. (plaintiff's exhs. 11 and 11a).

Of the eighteen individuals in the Second Cycle, eleven, including the plaintiff, sat for the January 16, 1975 Journeyman's examination ("January examination").[4] Of the eleven individuals who sat for the January examination, four passed and seven failed. The four passing scores were 61.5, 56, 51.5 and 45, by trainees Bologna, Smith, Jones and Robinson, respectively.[5] On March 11, 1975, Local 41 admitted Bologna, Smith, Jones and Robinson. (plaintiff's exh. 31).

After failing the January 1975 examination, the Second Cycle trainees who failed, or their representative, communicated with Build requesting to view their January examination and to take another examination. Although Local 41 denied them an opportunity to view their examinations, it agreed to administer a second examination to the Second Cycle trainees who failed the January examination. (plaintiff's exh. 21, p.1, minutes of March 3, 1975 meeting). In preparing for a second Journeyman's examination, the plaintiff did not participate in additional classroom training but continued study of his coursebook material with other trainees, absent instructors.

On May 1, 1975, the plaintiff sat for a second Journeyman's examination ("the May examination"). The plaintiff achieved a score of 58, deemed a failing grade by Local 41. (plaintiff's exhs. 13 and 13a.). Of the seven individuals in the Second Cycle who failed the January examination, six

---

2. The plaintiff testified that on his weekly examinations he averaged 85%. Plaintiff's exhibit 7, not admitted into evidence, reflects that the plaintiff averaged 80.5%.

3. There is no evidence of the plaintiff's performance on these comprehensive examinations.

4. The remaining seven dropped out of the Second Cycle before the January examination.

5. This Court has no evidence of the scores of the other Second Cycle trainees deemed by Local 41 to have failed the January examination.

including the plaintiff, sat for the May examination. Of those six, one passed, trainee Scarver, with a score of 74 & 1/6. (plaintiff's exh. 14).[6] On May 13, 1975, Local 41 admitted Scarver. (plaintiff's exh. 31).

Local 41 continued to deny the request of the plaintiff and other Second Cycle trainees to view their graded examinations on the grounds that union policy was not to release completed examinations. Local 41 also denied the plaintiff's request to take a third Journeyman's examination. (plaintiff's exh. 18, p. 4, minutes of October 16, 1975 meeting; plaintiff's exh. 21, minutes of November 6, 1975 special meeting).

The only evidence before this Court indicating the history of the remaining three cycles of the training program is the plaintiff's exhibit 31, a Local 41 document entitled "Overall Report."

Of fifteen individuals enrolled as trainees in the First Cycle, one individual resigned and Local 41 admitted fourteen after passing the Journeyman's examination. Of the fourteen individuals in the First Cycle who sat for the Journeyman's examination, eight passed the examination in a single attempt. All six who failed to pass in their first attempt, also failed the Journeyman's examination in their second attempt. All six passed the Journeyman's examination in their third attempt. (plaintiff's exh. 31). The First Cycle was the only Cycle of the four afforded three opportunities to pass the Journeyman's examination.

Of twenty individuals enrolled as trainees in the Third Cycle, six individuals resigned and Local 41 admitted six after passing the Journeyman's examination. Apparently, one other individual, Briggs, passed but was not admitted into Local 41. Two individuals failed after one Journeyman's examination and did not sit for a second examination and three individuals failed after two examinations. One individual, Pettway, did not show for one Journeyman's examination, and one, Hicks, re-

mains unaccounted for. (plaintiff's exh. 31).

Of twenty-one individuals enrolled as trainees in the Fourth Cycle, four resigned, and the remaining seventeen are unaccounted for. (plaintiff's exh. 31). However, Daniel Erker of Local 41 testified that at least some of the seventeen became union members.

## CONCLUSIONS OF LAW

Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, provides in relevant part:

> (c) It shall be an unlawful employment practice for a labor organization—
>
> > (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

Section 703 further provides:

> (d) It shall be unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

Local 41 is a labor organization as defined in 42 U.S.C. § 2000e(d).

## I. DISPARATE TREATMENT

The plaintiff's general disparate treatment theory is that Local 41 maintained a discriminatory admission policy with respect to the minority trainees when compared to their similarly situated mostly nonminority apprentice counterparts.

■ Initially, the plaintiff has the burden of establishing a prima facie case of disparate treatment discrimination. Should the plaintiff establish his prima facie case, the burden shifts to Local 41 to articulate a

---

**6.** This Court has no evidence of the scores of the other Second Cycle trainees deemed by Local 41 to have failed the May examination.

legitimate, nondiscriminatory reason for the plaintiff's rejection from admission. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If Local 41 articulates a valid reason, the burden returns to the plaintiff, who must then establish by a preponderance of the evidence that the claimed nondiscriminatory reason advanced by Local 41 is a pretext for discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1094. To show pretext, the plaintiff need not directly prove discriminatory intent but instead may show the reasons articulated by Local 41 were not the true reasons for its actions. *See, Lopez v. Metropolitan Life Insurance Company,* 930 F.2d 157, 160–161 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991). Ultimately, the plaintiff retains the burden of persuading the fact finder that the alleged discrimination occurred. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

### A. *Plaintiff's Prima Facie Case*

■ To establish his prima facie case of individualized disparate treatment, the plaintiff must show: 1) that he is a member of a protected class; 2) that he applied for membership to Local 41; 3) that he was qualified for admission; 4) that Local 41 rejected his admission; and 5) that after rejecting the plaintiff, Local 41 continued to seek applicants of at least plaintiff's qualifications for admission. *See Burdine,* 450 U.S. at 253–56, 101 S.Ct. at 1094–95; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

It is undisputed that the plaintiff has established the first, second and fourth elements of his prima facie case. He is black, applied for admission into Local 41 via its training program, and Local 41 rejected his admission. Local 41 disputes the third and fifth elements of the plaintiff's prima facie case.

Local 41 contends that the plaintiff has failed to establish that he was qualified for admission and argues, in fact, that the plaintiff was not qualified for admission because he failed on two occasions to pass the Journeyman's examination. The evidence at trial leads this Court to conclude that at the time the plaintiff sought admission into Local 41, union policy was that the admission of trainees, such as the plaintiff, was conditioned upon their successfully completing the Journeyman's examination.

In response, the plaintiff argues that he met all qualifications for admission into the training program and successfully completed all aspects of the program. The plaintiff emphasizes that successful completion of the Journeyman's examination was merely a pretextual qualification for admission into the union and that Local 41 admitted apprentices well before the apprentices sat for the Journeyman's examination. The plaintiff also contends that Local 41 designed the Journeyman's examination and administered it to the plaintiff, as a member of the Second Cycle, to eradicate or greatly diminish the possibility that he would pass the examination and, therefore, gain admission into the union.

Here, the qualification element of the plaintiff's prima facie case coincides with Local 41's attempt to show a legitimate nondiscriminatory reason for denying the plaintiff admission. Ultimately, the plaintiff has the burden to show discrimination, and, in the process, to overcome Local 41's articulated nondiscriminatory reason for conditioning his admission upon successful completion of the Journeyman's examination. As discussed below, this Court concludes that the plaintiff's successful completion of the Journeyman's examination was not a legitimate nondiscriminatory reason for denying the plaintiff admission.

In *Fudge v. City Of Providence Fire Department,* 766 F.2d 650, 655 (1st Cir. 1985), the First Circuit confronted a similar conundrum where a Title VII defendant's articulated nondiscriminatory reason for denying a plaintiff admission into a fire department—that the plaintiff failed to score high enough on a composite evaluation system—coincided with its argument

that the plaintiff was not qualified for admission to the fire department because his composite qualification score was too low. The Court said

> [h]owever the matter is viewed, the litigative stage was clearly reached at which the burden was on the plaintiff to prove by a preponderance of the evidence that in 1974 a disparate and adverse impact was visited on blacks by defendant's use [of a composite scoring system].

The same reasoning applies in this case. Therefore, this Court rejects Local 41's position that the plaintiff could not demonstrate his qualification for admission based on his failure to pass the Journeyman's examination and that the plaintiff has failed to establish that element of his prima facie case.

Finally, this Court finds that the plaintiff has established the last element of his prima facie case, that after rejecting the plaintiff, Local 41 continued to seek applicants of at least plaintiff's qualifications for admission. Local 41 continued to recruit and train applicants into both the training and apprentice programs during the plaintiff's training and after he failed the January and May Journeyman's examinations.

### B. *Local 41's Articulated Non-discriminatory Reason For Denying The Plaintiff Admission*

Through the testimony of Daniel Erker, the only defense witness, Local 41 offers one simple non-discriminatory reason for denying the plaintiff admission: Local 41 contends that because the plaintiff could not pass the Journeyman's examination, the plaintiff was not qualified for admission and, therefore, not admitted. Erker testified that the purpose of requiring the trainees, such as the plaintiff, to pass the Journeyman's examination was so that they could "complete their training." Local 41 offered no other evidence, documentary or testimonial, providing an alternative reason for denying the plaintiff admission. In fact, the totality of the evidence in this case is fully consistent with Erker's testimony. Local 41 admitted trainees who passed the Journeyman's examination, both

in the Second Cycle and other cycles, while Local 41 did not admit trainees, such as the plaintiff, who failed the examination.

### C. *The Plaintiff's Evidence That Local 41's Reason Is Pretextual*

As noted above, to show pretext, the plaintiff need not directly prove discriminatory intent but must at minimum prove by a preponderance of the evidence that Local 41's articulated reasons for denying the plaintiff admission were not its true reasons.

This Court concludes that the plaintiff has met his burden of proving that Local 41's articulated reason for denying him admission is merely a pretext for discrimination.

Although, *inter alia,* Local 41 no longer maintains the apprentice examinations, so this Court cannot conclude that Local 41 actually tested trainees and apprentices differently, it remains undisputed that during the relevant period the apprentices took the Journeyman's examination at the end of their fourth year of classroom training and that the apprentices and trainees used the same coursebook material for their classroom instruction, which Local 41 concedes is the source for material tested on the Journeyman's examination. In fact, the only difference between the classroom portions of the training and apprentice programs was the fact that the trainees studied the material at an accelerated pace. The evidence at trial clearly demonstrated the qualifications for admission into the training program, although the evidence was not entirely clear as to the qualification for admission into the apprentice program at the time that the plaintiff was accepted into the training program, other than that trainees had to be at least 25 years old, "the apprenticeship age." Viewing the totality of the evidence, however, this Court concludes that the qualifications for admission into the training and apprenticeship program were similar.

The evidence conclusively establishes that Local 41 admitted apprentices upon their entrance into the apprentice program, more than four years before the appren-

tices sat for the Journeyman's examination but, at the same time, conditioned admission of the plaintiff, as a trainee, upon his successful completion of the Journeyman's examination. Based on the evidence, which established the fact that all trainees who passed the Journeyman's examination gained admission to the union, this Court concludes that had the plaintiff and other trainees passed the Journeyman's examination, Local 41 would likely have admitted them into its membership.

■ As noted above, at trial the lone business justification which Local 41 offered to support its policy of requiring trainees to pass the Journeyman's examination before admitting them was that the examination was a necessary part of the training process to qualify the trainees for admission. Thus, while Local 41 viewed trainees' passage of the Journeyman's examination a qualification of their union membership, Local 41 did not view passing the same test a qualification to union membership for apprentices. In fact, Erker also testified, and it remains undisputed, that apprentices who failed the Journeyman's examination still retained their union membership. The fact that Local 41 admitted apprentices and even retained them in its membership irrespective of their performance on the Journeyman's examination undercuts Local 41's claim that passage of the Journeyman's examination was a necessary and valid qualification for admission. Local 41 offers no other evidence to counter the plaintiff's contention that completion of the Journeyman's examination was a pretextual qualification for admission. Therefore, based on all the evidence at trial, this Court finds that by denying the plaintiff admission into its membership, Local 41 treated the plaintiff differently than it treated the vastly nonminority apprentices, for no other reason than the fact that he is a minority.

In its posttrial brief Local 41 asserts two arguments in an attempt to justify its disparate admission policy. First, Local 41 argues that because the trainees earned merely a modest stipend, "... it would hardly be fair or reasonable to expect those minority trainees to become union members upon their entrance into the Affirmative Action Program." This post hoc rationalization is unavailing. Initially, this Court emphasizes that the only business justification for Local 41's disparate admission policy with respect to trainees and apprentices offered into evidence at trial and which this Court can consider, in the form of Erker's testimony, was that the Journeyman's examination was a necessary qualification for union admission. Local 41 offered no evidence, and therefore this Court does not find, that other nonpretextual justifications existed to support the policy of conditioning the admission of trainees on their completion of the Journeyman's examination. Moreover, even accepting Local 41's posttrial argument, in light of the trainee's lesser ability to pay union dues, if true but which this Court does not find, Local 41 could have implemented alternatives besides denying the trainees admission altogether, such as, for example, reduced dues in exchange for reduced benefits. As noted above, apprentices who *failed* the Journeyman's examination still retained their union membership. Local 41's conduct, therefore, demonstrates that passing the Journeyman's examination was not a necessary qualification for union admission.

Second, Local 41 argues that its policy of admitting apprentices before they passed the Journeyman's examination "... is irrelevant to the question of intentional discrimination[ ]" because "... job classification status, i.e. journeyman electrician status" was relevant to employment opportunity and not mere union membership status. In other words, Local 41 means that an apprentice union member who did not pass the Journeyman's examination would not be referred for employment by Local 41 and therefore was in no better shape than a trainee denied admission into the union.

Initially, this Court emphasizes that this lawsuit concerns Local 41's denial of membership status to the plaintiff, not work referrals available to union members. As a practical matter, Local 41 presented almost no evidence with respect to apprentice union members who failed the Journeyman's examination and what role within the union

they may have had. Erker testified that they might assume another, perhaps unskilled, line of work. This Court cannot conclude, as Local 41 now urges, that union membership status absent a work referral was entirely unmeaningful. It is reasonable to conclude that membership status alone might confer some benefit in terms of opportunity in some other capacity, an opportunity denied the plaintiff.

Therefore, this Court concludes the that plaintiff has proven by a preponderance of the evidence that Local 41 discriminated against him because of his race.

This conclusion puts the issue of Local 41's liability for disparate treatment to rest. However, because the parties spent much effort presenting it, this Court now addresses other documentary and testimonial evidence submitted by the parties relevant to the issue of disparate treatment.

In attempting to show that successful completion of the Journeyman's examination as a condition to plaintiff's membership was a pretext for racial discrimination, the plaintiff introduced documentary and testimonial evidence intending to show: first, that Local 41 applied different testing rules to him than to the apprentices; and, second, that Local 41 designed and administered the Journeyman's examination in a fashion calculated to keep the trainees out of the union or, at least, to make their admission extremely difficult. As to the first general claim, the plaintiff argues that, as a trainee, Local 41: a) denied him an opportunity to view his failed examinations although Local 41 afforded apprentices that opportunity; and b) denied the plaintiff an opportunity to take a third Journeyman's examination although Local 41 afforded apprentices that opportunity. As to the second general claim, the plaintiff claims specifically that: a) the January exam was illegible; b) that the material on the examination deviated from material taught in the classroom; and c) that Local 41 arbitrarily graded his examination. Viewing all the evidence presented at trial,

this Court concludes that the plaintiff has failed to show that Local 41 applied different testing policies to him than to apprentices or that Local 41 unfairly administered the Journeyman's examination.

Initially, consistent with the dearth of evidence submitted with respect to the operation of the apprentice program, no apprentice examinations from any testing years were submitted as evidence.[7] Therefore, although the evidence establishes that the trainees and apprentices studied the same coursebook material to prepare for their Journeyman's examinations, this Court cannot and does not determine that Local 41 tested the trainees and apprentices differently, or, in other words that the Journeyman's examinations given to the trainees, including the plaintiff, varied qualitatively or quantitatively from the Journeyman's examination given apprentices.

The plaintiff testified that Local 41 granted the apprentices an opportunity to take the Journeyman's exam more than twice. However, there is absolutely no evidence before this Court corroborating this alleged fact. It is true that the First Cycle trainees were afforded an opportunity to take a third Journeyman's examination. However, based on the totality of the evidence, this Court concludes that this opportunity was a departure from union policy and, in any event, not a race conscious distinction from the plaintiff. Similarly, the evidence establishes that Local 41's policy was that completed Journeyman's examinations were not available for viewing, either to trainees or to apprentices.

The plaintiff also contends that Local 41 administered the January and May Journeyman's examinations to the plaintiff four and nine months after his completion of classroom training, respectively, without any additional professional instruction before either examination. As noted above, after completing his classroom instruction the plaintiff began simulated on-the-job training and actual on-the-job training before sitting for the January examination.

---

7. Erker testified that apprentice exams from the mid–1970's are no longer maintained by Local 41.

It is undisputed that the plaintiff retained his coursebook materials at least until he sat for the May examination. Erker testified that the apprentices took their Journeyman's examination at the completion of their four year classroom course. This Court is suspect of the reliability of Erker's testimony because, as referenced throughout this Decision, he had no knowledge of most aspects of the apprentice program during the relevant time period, including the testing of apprentices. However, fully crediting Erker's testimony this Court does not find this fact, viewed by itself, very probative of intentional discrimination.

The plaintiff argues that Local 41 designed the January examinations to be difficult to read and, therefore, to pass. The plaintiff and Harold Hudson, a fellow Second Cycle trainee who also failed the January examination, testified that the examination was difficult to read. The plaintiff also testified that the lighting in the room where he took the January examination was poor.

This Court has thoroughly examined plaintiff's original January examination. (plaintiff's exh. 11a). Although it is tightly spaced, this Court does not conclude it to be illegible. Moreover, although seven Second Cycle trainees failed the January examination, four Second Cycle trainees passed the examination, somewhat diminishing the plaintiff's illegibility claim.

The plaintiff also claims that the subject matter of the Journeyman's examinations was presented in a foreign or more complex fashion than the material was presented during the classroom training. The only evidence relating to this claim is the testimony of the plaintiff and Harold Hudson, and the original examinations and coursebook materials. The plaintiff and Hudson similarly testified that the subject matter appeared different or "rearranged" compared to the way it had been presented in the classroom. However, the plaintiff and Hudson also testified that at least some of the material on their examinations appeared to have been covered in the classroom. This Court emphasizes that, perhaps due to the length of time which passed since they took their examinations, their recollections of the details of the examinations were less than lucid. Moreover, the plaintiff's testimony demonstrated that he no longer has a grasp of the subject matter of the examinations, also undercutting his reliability.

This Court concludes that the evidence does not support a finding that the presentation of the subject matter on the Journeyman's examinations given to the plaintiff so deviated from the material presented in the classroom so as to indicate an intent to discriminate. There is virtually no evidence with respect to Local 41's formulation of the Journeyman's examinations given to the Second Cycle. The only evidence with respect to the formulation of the examinations came from John Mose, who served as the Executive Director of BAAP and a counselor to BUILD, and Erker. Both testified that Local 41 designed the Journeyman's examinations given to the plaintiff, as a participant in the Second Cycle, to test material taught during the classroom training. Classroom instructors were not members of Local 41's examining board and, according to the testimony of John Mose, which stood uncontradicted, the instructors did not formulate the Journeyman Electrician's examination or participate in its formulation. In fact, there was no evidence to establish that the examining board formulated the Journeyman's examinations, although it can reasonably be inferred from the testimony of Mose and Erker.[8]

Because one of the plaintiff's classroom instructors, Edward Panus, is deceased, and neither party called the other instructor, Norris Bailey, this Court heard no testimony from them, any member of Local 41's examining board during the relevant time, or any other qualified individual as to whether the Journeyman's examinations fairly tested material learned by the train-

---

8. In its pretrial statement, Local 41 listed several individuals from its examining board as prospective witnesses, although it did not call any of them at trial. Certainly the plaintiff could have subpoenaed these witnesses.

ees in the classroom. Moreover, there was no expert testimony presented by either party which might shed some light on the plaintiff's claim. This Court has no experience in the field of electrical engineering and, therefore, certainly is ill equipped to analyze the content of the Journeyman's examinations against the training program coursebook materials to make a valid determination as to whether the examinations fairly tested the subject matter taught in the classroom.

It is true that plaintiff averaged at least 80% on periodic tests taken during his classroom training. However, this alone does not establish that the content of the Journeyman's examination deviated from the subject matter taught in the classroom. There are numerous other factors which could attribute for the plaintiff's poor performance on the Journeyman's examination, such as, for example, his preparedness.

There was no other evidence presented to this Court on this issue. In sum, there is no evidence which could lead this Court to conclude that the content of the plaintiff's January and May Journeyman's examinations deviated from the subject matter presented to plaintiff during the classroom instruction.

The plaintiff also argues that Local 41 graded the plaintiff's Journeyman's examinations arbitrarily. In support of this claim, the plaintiff emphasizes that he failed the May examination with a higher score than scores of other Second Cycle trainees deemed passing on the January exam. However, this fact, alone, is meaningless unless this Court were to adopt the underlying inference which the plaintiff has made, that the content of the two examinations was qualitatively and quantitatively similar to a degree that numerical scores achieved on either examination were relatively equivalent. This Court rejects the inference because there is no evidence to support it. This Court has no evidence before it which indicates: a) the existence of a minimum passing grade for either examination; b) whether Local 41 maintained a minimum passing grade for either examination; c) the maximum possible score on either examination; d) who graded the examinations; and e) Local 41's examination grading process for either examination.[9]

Moreover, the evidence indicated that there existed no standard answer key for the January examination. If one existed, it was not submitted to this Court. Plaintiff's exhibit 10 is a copy of an answer key for the May examination. Merely looking at the plaintiff's completed examinations and the completed examinations of other Second Cycle trainees, both of whom passed and failed, (plaintiff's exh. 12, defendant's exh. F), this Court cannot on its own determine the methodology which the grader(s) used in determining the grades on either the January or May examinations, for example, the values afforded each answer on either examination or whether the complexity of the questions triggered differing point values.

Therefore, having considered all the evidence, this Court does not find that Local 41 graded the plaintiff's Journeyman's examinations arbitrarily.

Having held that Local 41 discriminated against the plaintiff based on his race by virtue of its disparate admission policy applied to the plaintiff, as a minority trainee, this Court now addresses the remaining portion of the plaintiff's Title VII claim.

## II. DISPARATE IMPACT

As an alternative ground for relief, the plaintiff contends that Local 41's admission selection process had a disparate impact on

---

9. Plaintiff also points to the fact that an answer of "2.55 amps" given by one trainee on the January examination and an answer of "2.86 amps" given by another trainee to the same question on the same examination both were given credit by the grader. Arguably, it is not unreasonable for answers within a certain range to be entitled to the same credit. This Court emphasizes this point to demonstrate that absent evidence of the methodology employed by the examination graders, this Court cannot determine, as plaintiff insists, that Local 41 graded the examinations inconsistently and that such inconsistencies, if any, evidence discrimination.

the trainees, including the plaintiff. Identifying the Journeyman's examination as the allegedly discriminatory employment practice, the plaintiff claims that the apprentices had a 100% passage rate on the Journeyman's examination while the trainees had a 60% or less passage rate on the Journeyman's examination. The plaintiff contends that the requirement that trainees successfully complete the Journeyman's examination before admission into the union caused the selection of applicants for admission in a racial pattern significantly different from the pool of qualified applicants, consisting of the trainees from all cycles and the apprentices from the years 1973–1976. The plaintiff relies on statistical evidence to establish his prima facie case of disparate impact racial discrimination.

It has already been established that although the apprentices did sit for the Journeyman's examination, successful completion of the Journeyman's examination had nothing to do with the admission of apprentices into Local 41 and that the same cannot be said for the trainees. Local 41's admission policy, then, did not place the trainees and apprentices on equal footing with respect to the significance of the examination in the selection process. However, *arguendo*, addressing the plaintiff's alternative theory and isolating the Journeyman's examination, this Court finds that there is insufficient evidence in which to conclude that the Journeyman's examination had a disparate impact on minorities.

### A. Qualified Applicant Pool

Generally, the evidence establishes that both the training and apprentice programs were geared to qualify individuals to become Journeyman Electricians. Erker testified that selection committees chose applicants to either program. Both the trainees and apprentices utilized the same coursebooks for their classroom training and both sat for the Journeyman's examination which tested them on their classroom training. Therefore, this Court views the largest applicant pool as all trainees and all the apprentices during the four year period from 1973 to 1976.

However, this Court notes that the racial make-up of the applicant pool cannot be conclusively determined according to whether an individual was a trainee or an apprentice. Although this Court has no documentary evidence before it on this issue, based on the testimony at trial, it is safe to say that the trainees, recruited by the BAAP through Build, were minorities. At least some of the apprentices who graduated from the apprentice program and passed the Journeyman's examination were also minorities. There is no evidence before this Court which clearly establishes the number of apprentices from 1973 to 1976 who were minorities although this Court believes the percentage of minority apprentices was small. Plaintiff attempted to elicit testimony from Erker that few of those who completed the apprentice program were minorities. Of the one hundred individuals who completed the apprentice program in the four years from 1973 to 1976, Erker testified that he recognized but a handful of minorities. However, this Court does not view Erker's testimony on this issue, which was speculative, conclusive.

### B. Prima Facie Case Of Disparate Impact

To establish his prima facie case of disparate impact discrimination, the plaintiff must show that the Journeyman's examination itself caused the failure of the minority trainees to gain admission into Local 41, regardless of Local 41's intent.

In two relatively recent visitations of the disparate impact theory, the Supreme Court has emphasized that to establish a prima facie case of impact discrimination, a Title VII plaintiff cannot rely on the mere fact that

> ... 'at the bottom line,' there is a racial *imbalance* in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.

*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657, 109 S.Ct. 2115, 2124, 104

L.Ed.2d 733 (1989) (emphasis supplied). Where the plaintiff relies on statistical disparities to establish a prima facie case, the disparities "... must be sufficiently substantial that they raise ... an inference of causation." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 995, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988).

■ In this case, the plaintiff has not met his burden of establishing a prima facie case of disparate impact discrimination. This Court finds that the plaintiff's statistical analysis is not sufficiently reliable so that this Court can infer that the examination caused the racial disparity which the plaintiff cites.[10]

The plaintiff relies on two statistics to make out his prima facie case of disparate impact: 1) the percentage of trainees who successfully completed the Journeyman's examination, mostly derived from plaintiff's exhibit 31 and supplemented by Erker's testimony; and 2) the percentage of apprentices who successfully completed the Journeyman's examination, derived from plaintiff's exhibit 24 and Erker's testimony. Exhibit 31 is a Local 41 document entitled "Overall Report." It analyzes the training progress of trainees in all four cycles, including their examination results.

According to the plaintiff, a total of fifty-six trainees, from all four cycles, sat for the Journeyman's examination at least twice between 1973 and 1976. Of those fifty-six, 60.3% passed the examination.[11] This Court finds the plaintiff's statistic reliable insofar as it includes the first three cycles.

The evidence with respect to the Fourth Cycle, however, is incomplete. In his post-trial brief, the plaintiff contends that nine of seventeen trainees in the Fourth Cycle passed the Journeyman's examination. Plaintiff derives this statistic by combining the information contained in exhibit 31 regarding the Fourth Cycle with Erker's testimony. Most of the information in exhibit 31 regarding the Fourth Cycle is incomplete. It lists twenty-one individuals enrolled in the Fourth Cycle and states that four of them resigned. Of the remaining seventeen, exhibit 31 says nothing. Erker could not say how many Fourth Cycle trainees sat for the examination. It certainly is not clear that all seventeen remaining trainees took the Journeyman's examination. Therefore, it has not been conclusively established that seventeen individuals in the Fourth Cycle sat for the Journeyman's examination. Viewing exhibit 31, Erker testified that he recognized nine individuals who are now members of Local 41. It can be deduced that they must, then, have passed the Journeyman's examination to gain admission. Erker qualified his testimony by stating that he could not offer a precise statistic on those in the Fourth Cycle who passed the Journeyman's examination. If the Fourth Cycle is removed from the plaintiff's statistics, thirty-nine trainees sat for the Journeyman's examination and twenty-five passed, for a passage rate of about 65%, when including all three examinations given to the First Cycle. Removing the Fourth Cycle and limiting the First Cycle to two examinations, the passing rate in the first three cycles drops to about 48%.[12]

However, even accepting the reliability of the plaintiff's data regarding the Fourth

---

10. The Civil Rights Act of 1991, which may or may not apply to this case, undercuts portions of the *Wards Cove* analysis once the plaintiff has established a prima facie case of disparate impact. In this case, because the plaintiff has failed to establish a prima facie case of disparate impact, this Court need not and does not now address the Civil Rights Act of 1991.

11. Local 41 afforded six trainees in the First Cycle who failed two successive Journeyman's examinations an opportunity to take a third examination. All six passed the third examination. Thus although First Cycle trainees, overall, had a 100% passage rate, the First Cycle

passage rate drops to 57% when considering only the first two exams. The plaintiff's statistic includes the third examination in the First Cycle. If the results of the third examination of the First Cycle are removed in the statistic involving all trainees, the passage rate decreases to 49.55%.

This Court also notes that some trainees in at least the first three cycles passed the Journeyman's examination in one attempt.

12. Isolating the Second Cycle, eleven trainees took the Journeyman's examination and five passed, representing a passage rate of approximately 45%.

Cycle, this Court, for the reasons discussed below, still finds that the plaintiff has failed to establish a prima facie case of impact discrimination.

According to the plaintiff's exhibit 24 [13], one hundred individuals graduated from the apprentice program between 1973 and 1976. According to Erker's testimony, to "graduate" from the apprentice program, the apprentices were required to pass the Journeyman's examination. Erker also testified that those apprentices who failed the examination, already members of Local 41, retained their union membership. But even accepting the fact that all apprentices who graduated passed the examination, at most exhibit 24 indicates that 100 apprentices passed the examination between 1973 and 1976. Exhibit 24 does not indicate the number of apprentices who sat for the Journeyman's examination but failed to pass. This Court concedes that Erker testified that he knows of no apprentices who have failed the apprentice examination, except perhaps one individual recently. However, Erker's testimony on this issue was speculative with respect to the relevant years—1973 to 1976—and, therefore, this Court does not view Erker's testimony to be conclusive, or even fairly probative, of the passage rate of apprentices on the Journeyman's examination. In fact, other evidence before this Court, not cited by either party, indicates that apprentices did fail the Journeyman's examination. (*See* plaintiff's exh. 21, minutes of June 19, 1975 special meeting).[14]

13. Exhibit 24 is an amalgam of Local 41 documents containing the names of individuals graduating from the apprentice program in particular years.

14. The only Local 41 official to testify in this entire case was Daniel Erker. However, Erker had no knowledge of many important facts which the plaintiff argued supported his claim, particularly facts pertaining to the Second Cycle.

For example, Erker specifically testified that he has no knowledge of the following: 1) who prepared the January and May 1975 exams; 2) how many Second Cycle trainees passed the January and May examinations; 3) whether trainees who failed the exam, including the plaintiff, requested to view their exams, although the evidence clearly shows that requests

This Court does not discount the plaintiff's statistical evidence altogether. However, the Supreme Court has cautioned that the usefulness of a particular statistic "... depends on all of the surrounding facts and circumstances." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1977). This Court simply does not find the plaintiff's statistics dispositive.

There are numerous deficiencies in the plaintiff's statistical proof which militate in favor of affording these numbers diminished weight.

First, this Court finds the statistic offered by the plaintiff regarding the passage rate of apprentices to be, without more evidentiary corroboration, at best inconclusive and at worst unreliable. Despite the plaintiff's contention that all apprentices who took the Journeyman's examination during the relevant years passed, at least some evidence exists which indicates that the apprentice success rate was less than 100%. There simply is no evidence which establishes, or at least reasonably indicates, the success rate of apprentices on the Journeyman's examination. This Court is not "... obliged to assume that [plaintiff's] statistical evidence is reliable." *Watson*, 487 U.S. at 995, 108 S.Ct. at 2789–90. ("[S]mall or incomplete data sets and inadequate statistical techniques" are "typical examples" of unreliable statistical data.)

by the plaintiff as well as other trainees were in fact made; 4) who graded the exams and the methodology, if any, of how they were graded, including whether Local 41 prepared answer keys for the exams or whether Local 41 established minimum passing scores; and 5) whether the trainees took periodic tests in the course of their classroom training, although the evidence clearly establishes that they did. Erker also testified that he has no knowledge of some basic points concerning the apprentice program during the time which the plaintiff was enrolled in the training program. For example, Erker does not know who taught the classroom material to the apprentices. In fact, Erker could not testify conclusively as to whether trainees took the same Journeyman's examination as did the apprentices.

Second, the plaintiff derives his statistics from a relatively small number of individuals, undercutting the significance of the plaintiff's statistical analysis. *See Frazier v. Consolidated Rail Corporation*, 851 F.2d 1447, 1451–52 (D.C.Cir.1988) (small sample size undercut plaintiff's impact analysis.); *Fudge v. City Of Providence Fire Department*, 766 F.2d 650 (1st Cir. 1985) (same); *Waisome v. Port Authority of New York and New Jersey*, 948 F.2d 1370, 1379 (2d Cir.1991) ("... where statistics are based on a relatively small number of occurrences, the presence or absence of statistical significance is not a reliable indicator of disparate impact."). As these cases indicate, the problem created by the statistically insignificant sample is that this Court cannot determine that the disparity is simply not the result of chance. This concern is particularly magnified by the fact that the data which the plaintiff derives from this small sample is not complete and, therefore, not entirely reliable.

Courts have sometimes consulted the EEOC's Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.-4(D), as a guide to determine whether the particular magnitude of a statistical disparity indicates a prima facie case of disparate impact under Title VII. That regulation establishes that a minority selection rate "... which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by Federal enforcement agencies as evidence of adverse impact...." However, that regulation also cautions that "[g]reater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant...." In that circumstance, the EEOC recommends alternative or supplemental procedures, such as evidence of the challenged procedure over a longer period of time or its use in similar circumstances elsewhere. In this case, the plaintiff offers no supplemental or alternative procedure to offset the small numbers offered.

Third, any unreliability created by the limited nature of the sample size and its incompleteness is further exacerbated by the fact that the plaintiff simply provided this Court raw data without any expert analysis. This Court is ill equipped to fashion what would be unartful conclusions about the data's overall reliability and probative value.

This Court is mindful of the admonition that "... in cases involving small or marginal samples, other indicia raising an inference of discrimination must be examined." *Waisome*, 948 F.2d at 1375. (Title VII plaintiff may establish a prima facie case of disparate impact by showing a "... statistically significant adverse impact coupled with other evidence of discrimination.") However, this Court has already identified the myriad of evidentiary deficiencies in this case. As discussed in this Court's analysis of the plaintiff's disparate treatment claim, the plaintiff failed to prove that Local 41 treated the trainees differently than the apprentices by testing them differently, and there was no evidence before this Court to conclusively establish that the trainees and apprentices even took the same examination (or did not take the same examination), in a qualitative or quantitative sense. No apprentice examinations were submitted to this Court.[15] In fact, there is some evidence before this Court indicating that the trainees may have taken an easier version of the Journeyman's examination. (plaintiff's exh. 21, minutes of November 6, 1975 Special Meeting). In sum, this Court concludes that there is no additional "other evidence" of discrimination which, when viewed along with the plaintiff's statistical proof, might indicate that the examination had a disparate impact.

Therefore, this Court concludes that the plaintiff has failed to make out a prima facie case of disparate impact. This Court need not and does not explore the plaintiff's disparate impact claim further.

---

**15.** It is true that Local 41 no longer maintained the apprentice examinations. But this Court must note that one of the consequences of the plaintiff's delay in filing this lawsuit is that less evidence is available for him to prove his case.

## III. LOCAL 41's AFFIRMATIVE DEFENSES

Finally, this Court addresses the two affirmative defenses which Local 41 raises and has argued throughout this litigation.

### A. *Statute of Limitations*

In its Answer as an affirmative defense, and later delineated in its posttrial brief, Local 41 contends that pursuant to the claims limitations provisions contained in Title VII many of the plaintiff's claims, not all of them, are time barred.

On March 12, 1976, the plaintiff filed a Complaint with the New York State Division of Human Rights ("State Division") (plaintiff's exh. 19). Pursuant to a work share agreement it had with the EEOC, and the plaintiff's authorization,[16] the plaintiff's State Division Complaint also constituted his administrative charge with the EEOC's New York District, Buffalo Office. The EEOC deemed the plaintiff's charge filed March 12, 1976, the same day as his State Division Complaint.[17]

In this case, because the State Division is a so called deferral agency, 42 U.S.C. § 2000e–5(e) ("§ 2000e–5(e)") requires that the plaintiff's Title VII charge be filed with the EEOC within the earlier of 300 days after the alleged unlawful employment practice occurred or within 30 days from the date he received notice that the State Division terminated the proceedings. On January 25, 1978, the State Division issued a notice of probable cause of discrimination with no findings of fact and set the matter for public hearing. (plaintiff's exh. 22). Therefore, in this case the applicable limitations period on the plaintiff's EEOC charge is 300 days after the alleged unlawful discriminatory practice.[18]

Plaintiff alleges numerous instances of discriminatory conduct, some occurring outside the limitations period (i.e. prior to 300 days before March 12, 1976) and some occurring within the limitations period. Local 41 argues that plaintiff alleges only discreet Title VII violations, rather than a continuing Title VII violation, and that any claims stemming from alleged discriminatory conduct occurring prior to 300 days before March 12, 1976 are time barred pursuant to § 2000e–5(e). The plaintiff has not addressed this issue.

This Court has already held, as discussed above, that Local 41 violated Title VII by conditioning the plaintiff's admission on passing the Journeyman's examination, although admitting apprentices irrespective of their performance on the Journeyman's examination. This is the only discrimination which this Court considers relative to Local 41's limitations defense.

■ This Court does not view the discrimination as an isolated or discreet act. Instead, Local 41 conducted a broader policy of discrimination aimed at minimizing, if not precluding, minority membership. The fact that the trainee program was instituted as an affirmative action program does not change this result.

Initially, it would defy common sense to characterize this discrimination as occurring at an isolated point in time. Rather, this Court finds that the discrimination occurred during and before the limitations period. For example, the date upon which Local 41 accepted the plaintiff into its

---

**16.** On his State Division Complaint, the plaintiff signed a preprinted statement which states:
> I also charge the above named respondent(s) with violating Title VII [sic] Civil Rights Act of 1964 ... and hereby authorize [State Division] to accept this verified complaint on behalf of the EEOC subject to the statutory limitations contained in Title VII.

**17.** *Sua sponte* this Court contacted the New York District, Buffalo Office of the EEOC and obtained this information.

**18.** For reasons unknown to this Court, the EEOC deemed the plaintiff's EEOC charge filed the same day the plaintiff filed his State Division Complaint, instead of deeming the plaintiff's EEOC charge filed 60 days after the State Division filing, pursuant to 42 U.S.C. § 2000e–5(c). *See EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988). Local 41 does not claim that the plaintiff failed to file his claim with the State Division within 240 days of the alleged discrimination. In any event, this Court also finds the plaintiff's State Division Complaint filed within 240 days of the alleged discrimination under the same analysis discussed below.

trainee program, well before the limitations period, constituted a date on which the discrimination occurred, because on that date Local 41 treated the plaintiff, because he is black, differently than apprentices—who were admitted upon their entrance into the apprentice program. Each day the plaintiff continued in the trainee program while denied an opportunity to join Local 41 constituted the continuing act of the discrimination. Moreover, the discrimination continued to the dates upon which the plaintiff took the Journeyman's examination, because Local 41 conditioned the plaintiff's right to join the union upon passing that examination although, at the same time, Local 41 continued to admit apprentices well before taking what the union characterizes as the same examination.

Therefore, the plaintiff has proven acts of discrimination both predating and well within the limitations period, all related to Local 41's disparate admission policy with respect to the trainees. As such, the plaintiff's claim is not barred by the limitations period contained in Title VII. *See Sabree v. United Brotherhood Of Carpenters And Joiners Local No. 33*, 921 F.2d 396, 399–402 (1st Cir.1990) (and citations therein); *Valentino v. United States Postal Service*, 674 F.2d 56, 65 (2d Cir.1982).

Therefore, this Court holds the plaintiff's recovery for discrimination not time barred by the limitations provisions contained in Title VII.

### B. *Laches*

■ Local 41 next argues, as an affirmative defense and in its pretrial legal memorandum, that "... the plaintiff's unexplained delay in the commencement of his Title VII action is so excessive and so prejudicial to the defendant that the doctrine of laches should bar his recovery."

As noted above, pursuant to the work share agreement between the State Divi-

sion and the EEOC, the EEOC deemed the plaintiff's Title VII charge filed on March 12, 1976, the same date the plaintiff filed with the State Division.

The State Division found probable cause for discrimination and scheduled the matter for a public hearing. There is no evidence before this Court to indicate the outcome of the public hearing, if any.

Although the EEOC apparently deferred to the State Division for purposes of investigating the plaintiff's claim, there is no evidence before this Court which indicates whether the EEOC made any contact with the plaintiff, either before or after the State Division completed its investigation. In other words, there is no evidence that the EEOC issued any documentation or statement of any kind to the plaintiff regarding his case. In fact, there is no evidence indicating that the plaintiff was notified or otherwise knew that the EEOC was deferring to the State Division's final determination, although apparently that was the case. Finally, there is no evidence with respect to the plaintiff's attempt to prod the EEOC into issuing a final determination or a Right To Sue Letter, pursuant to 42 U.S.C. § 2000e–5(f)(1), or whether the plaintiff realized sooner that he had a right to sue in federal court.

After the plaintiff filed this lawsuit, he requested and received a Right To Sue Letter from the EEOC. (plaintiff's exh. 32).[19] The Right To Sue Letter is dated December 17, 1986, more than ten years after the EEOC deemed the plaintiff's Title VII charge filed and more than eight years after the State Division issued a finding of probable cause.

Pursuant to this Court's inquiry of the EEOC's Buffalo office, the EEOC stated that it never received notice of the State Division's final determination and that is why it did not issue a Right To Sue Letter until the plaintiff requested one.[20] Al-

---

**19.** Soon after the plaintiff filed his First Amended Complaint, Local 41 moved to dismiss the lawsuit on the grounds that the plaintiff had not filed his Amended Complaint within 90 days of receiving a Right To Sue Letter. By Decision

And Order signed December 15, 1987, Judge Curtin denied Local 41's motion to dismiss.

**20.** Also pursuant to this Court's inquiry, the State Division recently informed this Court that in the mid–1970's, before the State Division and the EEOC had an effective system in place to

though Local 41 was on notice of the plaintiff's filing with the State Division, there is no evidence that it received any communication from the EEOC until that agency issued the Right To Sue Letter.

To prevail on its laches defense, Local 41 must prove "... (1) lack of diligence by the party against whom the defense is asserted and (2) prejudice." *Southside Fair Housing Committee v. City of New York*, 928 F.2d 1336, 1354 (2d Cir.1991).

In *Rozen v. District of Columbia*, 702 F.2d 1202 (D.C.Cir.1983), the D.C. Circuit addressed the issue, now raised in this case, of dismissing a *pro se* plaintiff's Title VII claim on laches grounds due to the plaintiff's delay in receiving a Right To Sue Letter.

Dismissing the Title VII claim on laches grounds, the district court found the 21 month delay between the EEOC's decision of no probable cause and the issuance of the Right To Sue Letter chargeable to the plaintiff. The district court found that the defendant was prejudiced by the delay because witnesses and records became unavailable during the course of the delay.

With respect to the issue of the plaintiff's delay in filing suit, disagreeing that the plaintiff should be held responsible for the delay in the issuance of the Right To Sue Letter, the Court of Appeals reversed the dismissal of plaintiff's Title VII claim; "[plaintiff] had a right to assume that such notice would be forthcoming, and we cannot impute to [plaintiff], proceeding *pro se*, knowledge of the statutory scheme that would have authorized him to file suit absent the notice." *Id.* at 1204.

This Court concludes that the same reasoning applies to this case and, therefore, holds that laches does not bar the plaintiff's recovery. It is true that the delay in this case is more substantial than in *Rozen*. However, unlike *Rozen*, in this case there is no evidence that the EEOC issued a

Right To Sue Letter until the plaintiff requested one. Moreover, in this case, there is no evidence, testimonial or documentary, to indicate that the plaintiff received any communication from the EEOC once he filed a Complaint with the State Division, although the EEOC deemed the plaintiff's Title VII charge filed upon the plaintiff's filing of a claim with the State Division and the State Division issued a finding of probable cause in 1978.

Particularly in light of the fact that plaintiff was proceeding *pro se* at that time, and recognizing Title VII's generally complex and comprehensive administrative scheme, this Court does not find the plaintiff's delay so unreasonable under the facts in this case so as to bar his claim under the doctrine of laches.

This Court is aware of authority holding a plaintiff's Title VII claim barred by a laches defense where the plaintiff delayed filing suit in federal court.

For example, in *Garrett v. General Motors Corp.*, 844 F.2d 559 (8th Cir.1988), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988), the Eighth Circuit affirmed the district court's holding that laches barred plaintiff's Title VII claim. In that case, plaintiff obtained a Right To Sue Letter, by request, approximately 14 years after he filed a Title VII charge with the EEOC. Although, as in this case, the EEOC failed to issue any determination on the plaintiff's claim to the plaintiff, the Court found that the plaintiff's attempts to contact the EEOC during the fourteen year period were minimal and that he did not actively pursue his claim. Similarly in *Jeffries v. Chicago Transit Authority*, 770 F.2d 676 (7th Cir.1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986), the Seventh Circuit affirmed the district court's holding that laches barred plaintiff's Title VII claim. In that case the

track filings which would be handled by the State Division pursuant to the work share agreement, such as the plaintiff's was in this case, it was possible, absent notice by the complaining party, the EEOC would receive no notice of the State Division's final determination. Therefore, although the EEOC may have deemed a Title

VII charge filed with the federal agency on the date the complaining party filed with the State Division, absent notice of the State Division's final determination, the EEOC would not issue a Right To Sue Letter, indeed not take any action, absent a request by the charging party. That apparently happened in the plaintiff's case.

EEOC issued a Right To Sue Letter ten years after the plaintiff filed his Title VII charge. The district court found that the plaintiff took no action with respect to his charge for nine of the ten years.

Unlike *Garrett* and *Jeffries*, in this case there is absolutely no evidence before this Court to indicate what efforts, if any, the plaintiff undertook to pursue his Title VII claim with the EEOC. Therefore, this Court cannot find, as did the Courts in those cases, the plaintiff simply did nothing for an extended period time. Additionally, in *Jeffries*, the plaintiff was represented by counsel during his state administrative proceedings, unlike the plaintiff here. It is unclear if the *Garrett* plaintiff proceeded *pro se*.

However, even had the Union shown that the plaintiff unreasonably delayed filing this lawsuit, Local 41 must still demonstrate that it suffered prejudice as a result of the delay. Local 41 has made no specific showing at trial with respect to its claimed prejudice. This Court assumes that Local 41, in accordance with its pretrial memorandum, is arguing that witnesses and evidence became unavailable over time. Several individuals employed by Local 41 and involved in events relevant to this lawsuit, who may have testified as defenses witnesses at trial, are now dead. Arguably, these individuals might have been key witnesses for the defense. However, there were several other available witnesses which Local 41 listed on its pretrial statement but did not call to testify at trial, including former officials of Local 41's examining board and one of the plaintiff's classroom instructors.

Additionally, although Local 41 did produce several Journeyman's examinations of Second Cycle trainees, Local 41 no longer had available the Journeyman Electrician examinations of apprentices for the same period. Local 41 cannot reasonably argue that it has suffered prejudice due to the unavailability of the apprentice examinations, because, in this Court's view, due to their absence the plaintiff was unable to prove much of his case. Local 41 has not

demonstrated the unavailability of any other evidence.

Therefore, this Court holds that the plaintiff's recovery is not barred by the doctrine of laches.

## CONCLUSION

For the reasons set forth above, this Court holds that the defendant, Local 41 of the International Brotherhood of Electrical Workers, discriminated against the plaintiff, Solomon Myree, Sr., because of his race in violation of Title VII of the Civil Rights Act of 1964.

## ORDER

IT HEREBY IS ORDERED, that this Court holds that the defendant discriminated against the plaintiff because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

SO ORDERED.